This appeal is from a decree dismissing a petition for divorce in a suit instituted by the wife for the cause of extreme cruelty, it being alleged generally that between November 1st, 1941, and March 1st, 1942, the husband frequently came to their residence in an intoxicated condition; that he frequently assaulted and injured her; that he would often visit a tavern located in the City of Newark in which the wife had an ownership interest, causing serious disturbances in the tavern by the use of vile and reprehensible language and attempted assault against the wife, which would *Page 428 
cause her to leave her place of business in fear of him and that because of his conduct in their residence she was obliged on three occasions to call the police. It was alleged also that at one time the wife made a formal complaint in police court against the husband but that because of his importunities and promises of reformation she withdrew the complaint.
The answer denied the allegations of extreme cruelty and by way of defense alleged that the husband had never done anything that would cause the wife to separate herself from him but that, notwithstanding, the wife did separate from him on March 2d 1942, and ordered him out of the residence and moved his clothes to the basement. It was admitted in the answer that the wife made an informal charge against the husband on November 1st, 1941, but that upon their appearance in court "they had quite a talk and settled their differences."
Upon the trial of the matter proofs were offered on behalf of the wife to establish the allegations of the petition. At the close of petitioner's case a motion for dismissal of the petition was made by counsel for the husband on the ground that the wife had not carried the burden of proof requisite to justify a decree for divorce. The learned advisory master granted this motion and advised the decree dismissing the petition upon the principal ground that "In my opinion the petitioner's case is wholly lacking in some of the essential elements necessary of proof in an action for divorce on the ground of extreme cruelty. Corroboration was not only lacking, but its attempt was indicative of artificiality."
Our examination of the case leads to a concurrence with the findings of the advisory master and, hence, an affirmance of the decree appealed from.
The wife testified that the marriage took place on January 7th, 1940; the parties went to live at the residence of the wife in the City of Newark; a sister, a niece and a nephew of the wife resided with them; that "for a couple of months" after the marriage they got along "all right," but after this brief period the husband "would get drunk on Friday night, Saturday and Sunday, call me all terrible names" and that with a few exceptions during the remainder of the time they *Page 429 
lived together the husband repeated these performances "every week-end, Friday, Saturday and Sunday." As to the other days of the week, she testified, "for a couple of days he would be sorry, promised me he would never do it again, and Friday and Saturday it would be the same thing all over." She testified that he would come to her place of business in an intoxicated condition and call her vile names and although he never struck her on these visits he did attempt it but she would "sneak out the back way and go home." On three occasions she was obliged to call the police. She had him arrested twice. She caused his arrest on one occasion because "he came home and started throwing the furniture around," and on the second occasion because he "was just raving, beating me and my sister and my niece." This latter event occurred "at my home, and I had the officers come, and he hit me in front of the officers." She testified also that "there was times when he would come home, I had to sleep four nights at the neighbors' house next door, I was so frightened of him." These neighbors, Mitchell by name, were not produced as witnesses on behalf of the wife because "Mr. Mitchell has passed away" and Mrs. Mitchell had "moved out of town." As a result of this course of behavior the wife stated that she became "just nervous and sick * * * I was all upset," and that she was not able to attend to her work regularly. She did, however, sleep with her husband throughout this entire period every night. Her sister and niece, who shared the residence, did not work although both were adult persons. The nephew did work.
She testified that her husband gave her $15 a week, out of his wages, except for a period when he was out of employment. She admitted that her husband "asked me to move away, but when he came to my home he knew just what he was walking into." Queried as to their privacy in the residence, she said: "My family was always there, but we had our privacy in our bedroom." As to the assaults made upon her person in their residence, the wife testified as follows:
"Q. He never struck you, as a matter of fact, did he? A. Yes, he did.
 Q. Was anybody present when he struck you? A. Yes. *Page 430 
 Q. Who? A. My sister and my niece and nephew.
Q. Everybody was present? A. It happened in my home.
Q. Did he ever strike you when no one was present? A. They were always there.
Q. They were always there? A. Yes.
Q. Twenty-four hours a day? A. Yes, always there."
Examined as to the matter of the husband being ordered out of the residence, she testified:
"Q. Was there the time you told him to get out? A. I asked him to leave, that we could never get along.
Q. How many times did you ask him to get out of the house? A. I asked him to leave every time I had him arrested.
Q. Beside that you always asked him to leave, that you didn't want to live with him? A. I asked him to leave because he was always creating so much trouble in the home."
It was the wife's admission that she weighed 158 pounds and was bigger than her husband, "but perhaps not as strong."
It appears also in her testimony that she had instituted a suit for separate maintenance against the husband but withdrew the petition in that matter and immediately instituted the present action "because I saw Mr. Amond drunk in July and August for about four weeks and I made up my mind that a divorce was the best thing for me."
The corroboration offered consisted of testimony of the niece of petitioner, who lived in the residence, the partner of petitioner in the tavern enterprise, a bartender at that tavern, and a customer of the tavern.
Viewing the testimony of these witnesses in an aspect most favorable to the petitioner we find no proper support of the main testimony. The niece testified that the husband "was a very inhuman person. She [the wife] was terrified of him all the time. He knocked her down. He would beat her. He would pull her hair out, try to crack her teeth. We always had to come between them." The husband struck the wife "all during their marriage. * * * He would always knock her down and take a piece of furniture to hit her with." She said that on one occasion the husband ran through the house nude; that her aunt was always nervous *Page 431 
and tense but that, after Mr. Amond left, her aunt "went back to her normal self. * * * She was happy go lucky again." A comparison of the testimony of this witness with the testimony of the petitioner clearly indicates gross exaggeration on the part of the niece, which, taken with certain inconsistencies in her testimony, renders it valueless. The same criticism, although in lesser degree, may be leveled against the testimony of the other witnesses.
It is significant that the sister and the nephew of petitioner, who lived at the residence, and who on the testimony of the wife, were "present all the time," were not offered as witnesses to support the cause of action. Of even greater significance is the fact that none of the police officers who were called to the residence by the wife were offered in her behalf, notwithstanding that she had testified "he hit me in front of the officers." Corroboration by the police officers who, presumably would have been indifferent as to the outcome of the suit, was in the circumstances of this case, indispensable. If these officers were not available that fact should have been shown. No attempt was made to specify the residence of Mrs. Mitchell other than that she had "moved out of town." It is not shown that any effort was made to locate Mrs. Mitchell. Nor is explanation offered as to why this neighbor was not produced to corroborate the statement that the wife "had to sleep four nights at the neighbor's house."
Certainly if the assaults upon the wife were as extensive as those described by the niece, it would seem that medical care would have been necessary, but no suggestion of this appears in the testimony.
It will be seen that in sustaining the findings of the advisory master we do not rely merely upon the opportunity of that judicial officer to observe and consider the attitude and demeanor of the witnesses, Cartan v. Phelps, 91 N.J. Eq. 312,
nor do we reject the testimony offered on the sole ground of its improbability, Rains v. Rains, 127 N.J. Eq. 328, but our determination rests upon the conclusion that the wife failed adequately to corroborate the charges made. The doctrine of corroboration "has not been evolved, nor is it intended *Page 432 
to permit petitioner to withhold the best evidence of facts essential to be proved in order to grant a divorce, where proof of those facts is obtainable" and "excusatory explanation" of the failure to produce the best evidence is the burden of petitioner,Lasker v. Lasker, 91 N.J. Eq. 353, 354, cited with approval in this court in Buckley v. Buckley, 95 N.J. Eq. 783, 788.
We have carefully considered the argument of appellant and except as the same is here treated we deem it to be without application.
The decree appealed from is affirmed.
For affirmance — THE CHIEF-JUSTICE, PARKER, CASE, HEHER, PORTER, COLIE, DEAR, RAFFERTY, HAGUE, THOMPSON, DILL, JJ. 11.
For reversal — DONGES, PERSKIE, WELLS, JJ. 3.